IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


ROBERT JOSEPH SMITH,
      Petitioner,

vs.                                   Case No.:  3:13cv446/MCR/EMT

MICHAEL D. CREWS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 20).  Petitioner filed a reply (doc. 23).

      The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 20).[1]  Petitioner was charged in the Circuit Court in and for Okaloosa County, Florida, Case No. 2009-CF-2388, with one count of robbery with a deadly weapon and wearing a

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 20).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

mask (Ex. B).  Following a jury trial, he was found guilty as charged (Exs. C, D, E).  He was sentenced to thirty (30) years of imprisonment, followed by ten (10) years of probation, with pre-sentence jail credit of 214 days (Exs. F, G).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D10-3668 (Ex. H).  Petitioner's counsel filed a brief, pursuant to Anders v. California, 386 U.S. 738 (1967), asserting that there were no meritorious arguments to support the contention that reversible error occurred in the trial court (Ex. I).  Petitioner was provided an opportunity to file a pro se initial brief (Ex. J), but he declined to do so.  The First DCA affirmed the judgment per curiam without written opinion on June 16, 2011, with the mandate issuing July 12, 2011 (Ex. K).  Smith v. State, 64 So. 3d 1267 (Fla. 1st DCA 2011) (Table).  Petitioner did not seek further review.

On September 22, 2011, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. L).  The state circuit court summarily denied the motion in an order rendered on December 2, 2011 (Ex. O).  Petitioner appealed the decision to the First DCA, Case No. 1D12-848 (Ex. R).  The First DCA reversed the lower court's decision, because the court failed to attach relevant portions of the record to its order (Ex. S).  The circuit court rendered an amended order on July 31, 2012 (Ex. T).  Petitioner again appealed the decision to the First DCA, Case No. 1D12-4239 (Exs. U, V).  The First DCA affirmed the decision per curiam without written opinion on April 25, 2013, with the mandate issuing May 21, 2013 (Ex. X).  Smith v. State, 111 So. 3d 885 (Fla. 1st DCA 2013) (Table).

Petitioner filed the instant federal habeas action on July 31, 2013 (doc. 1).  Respondent concedes the petition is timely (doc. 20 at 5).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.

In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an

unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits

in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claim.

III.    PETITIONER'S CLAIM

Ground One:  "The State courts unreasonably applied Strickland v. Washington, 466 U.S. 668 (1984) to Petitioner's claim that he was prejudiced by his trial counsel's failure to move to suppress the victim's identification of Petitioner as the perpetrator of a robbery of a convenience store."

Petitioner contends his trial counsel was ineffective for failing to move to suppress identification evidence (doc. 1 at 5).  He alleges counsel should have challenged the identification evidence on two grounds:  (1) the identification was the fruit of an illegal detention, and (2) the identification was unnecessarily suggestive, because the victims who identified him during a "show-up," James Bennet and Melissa Mayzik, were under the impression that a police dog had tracked the robber's scent to Petitioner (*id.*).

Without conceding or waiving an exhaustion defense, Respondent asserts "it appears that Petitioner has satisfied the exhaustion requirement" as to sub-claim 1 (counsel's failure to seek suppression of the identification evidence as fruit of an illegal detention) (doc. 20 at 14 n.2). Respondent contends the state courts adjudicated this sub-claim on the merits, and the courts' adjudication is entitled to deference under the AEDPA (*id.* at 15–22).  With regard to sub-claim 2 (counsel's failure to seek suppression of identification testimony from Mr. Bennet and Ms. Mayzik on the ground that the procedures employed by law enforcement were impermissibly suggestive), Respondent contends "it appears" Petitioner satisfied the exhaustion requirement only with respect to Mr. Bennet's identification (*id.* at 26).  Respondent contends the state courts' adjudication of Petitioner's claim regarding Mr. Bennet's identification is entitled to deference under the AEDPA (*id.* at 26–28).  Respondent contends Petitioner failed to fairly and properly present a claim regarding Ms. Mayzik's identification; therefore, that aspect of his claim is procedurally defaulted (*id.*).  Respondent contends notwithstanding the failure to exhaust, the claim as to Ms. Mayzik's identification is without merit (*id.* at 28–30).

A.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir.

2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Strickland</u>, 466 U.S. at 690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

B.     Federal Review of State Court Decision

In Ground 1 in Petitioner's Rule 3.850 motion, he argued the two "show-up" identifications conducted by law enforcement were illegal, because officers illegally detained him for the show-ups and failed to advise him of his right to counsel (Ex. L at 6).  Petitioner alleged that for each identification, a sheriff's deputy held him by the arm, led him to a patrol car where a witness was sitting, and told him to make a statement (*id.* at 7).  Petitioner alleged he did not wear a mask during the show-ups, even though the robber allegedly wore a mask during the robbery (*id.*).  Petitioner alleged one of the witnesses, Mr. Bennet, testified at trial that his identification of Petitioner was based upon his recognition of Petitioner's eyes and demeanor, as well as his belief that a police dog had tracked the robber's scent to Petitioner's house (*id.*).  Petitioner alleged the second witness (Ms. Mayzik) identified him because his voice and profile "were the only ones heard or shown" during the show-up (*id.*).  Petitioner argued the identification procedure was impermissibly suggestive (*id.*).  He additionally contended the show-up violated his constitutional rights, because prior to the show-up, police never advised him of his right to counsel, even though he asked if he needed a lawyer (*id.* at 8).  Petitioner alleged, "I merely done [sic] as advised by officer due to respect for the law.  I

consented to no identification." (*id.*).  Petitioner admitted that after the show-ups, an officer advised him of his rights (*id.*).

The state circuit court construed Petitioner's claim as alleging ineffective assistance of counsel based upon counsel's failure to seek suppression of the identification evidence (Ex. T at 69), which is the claim asserted in Petitioner's § 2254 petition.  The state court correctly stated the deficient performance and prejudice prongs of the <u>Strickland</u> standard as the applicable legal standard (*id.* at 68–69).  The court adjudicated the claim as follows:

First, Defendant argues that his trial counsel was ineffective for failing to move for the suppression of identification testimony of the victims in this case because it was gained through the use of an impermissibly suggestive "show-up" procedure and the use of a faulty "voice line up."

Florida Courts have provided guidance for consideration of "show-up" identification procedures and "voice line up" identification procedures.  As the State explains in its Response, because show-ups are inherently suggestive, they are subject to a different legal standard than a line-up.[FN 7]  A show-up is not invalid when it does not give rise to a substantial likelihood of irreparable misidentification given the totality of the circumstances.[FN 8]  There are several factors to consider: the opportunity of a witness to view the criminal at the time of the offenses, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the time of the confrontation, and the length of time between the crime and confrontation.[FN 9]  An identification made shortly after a crime is inherently more reliable than a later identification in court.[FN 10]

[FN 7:  <u>Blanco v. State</u>, 452 So. 2d 520, 524 (Fla. 1984)]

[FN 8:  <u>See</u> <u>Perez v. State</u>, 648 So. 2d 715 (Fla. 1995)]

[FN 9:  <u>Id.</u>; <u>See</u> <u>also</u> <u>Smith v. State</u>, 899 So. 2d 1264 (Fla. 5th DCA 2005)]

[FN 10:  <u>State v. Freber</u>, 366 So. 2d 426, 428 (Fla. 1978)]

As the State explains in its Response, with citation to the record and trial transcript, the above concerns are satisfied in this case and an attempt to suppress the show-up identifications would have been futile.[FN 11]  Both the victim, James Bennet, and the witnesses [sic], Melissa Mayzik, had ample opportunity to view the Defendant at the time of the crime.  Both gave a description of the suspect to law

enforcement immediately after the robbery.[FN 12]  Law enforcement arrived within ten minutes and a canine officer began to track the suspect within about forty minutes.[FN 13]  The "show-up" was performed within one hour and thirty minutes of the report of the robbery to law enforcement.[FN 14]  Based on the totality of the circumstances, there is no reason to find a substantial likelihood of irreparable misidentification.

[FN 11:  Exhibit A:  Trial Transcript, pages 60–76 and 27–59]

[FN 12:  Exhibit B:  Arrest Report]

[FN 13:  Exhibit C:  Trial Transcript, pages 126–127 and 79–89]

[FN 14:  Exhibit D:  Trial Transcript, page 143]

The same concerns exist for voice identifications.[FN 15]  Here, where the victims had a good opportunity to hear the criminal at the time of the offense with good degree of attention, made prior accurate descriptions of the criminal, displayed certainty in their identifications, and especially where there was a short amount of time between the criminal act and the voice identification, the Court does not find a substantial likelihood of irreparable misidentification.[FN 16]

[FN 15:  See Macias v. State, 673 So. 2d 176 (Fla. 4th DCA 1996) (detailed analysis of voice identification and other inherently suggestive identification procedures)]

[FN 16:  See Exhibits A, B, C, and D]

Although this ground must be denied based on the particular facts of this case, the Court recognizes that the identification procedures used by law enforcement in this matter are highly suggestive and carry a great potential for misidentification and should not be used but in the most exigent of circumstances.

(Ex. T at 69–70).

Petitioner appealed the decision to the First DCA, raising two issues:  (1) the lower court failed to address whether counsel was ineffective for failing to suppress the show-up identification evidence on the ground that it was the result of an illegal detention, and (2) the trial court failed to take into account the totality of the evidence in denying his claim that counsel was ineffective for failing to seek suppression of the show-up identification evidence as impermissibly suggestive (Ex. V).  As to the first issue, he argued he was illegally seized when two officers and a police dog

approached him while he was standing on his porch, and one of the officers displayed a gun while ordering Petitioner off the porch (*id.* at 3–8).  As to the second issue, he argued the show-up was impermissibly suggestive because the witnesses were influenced by their belief that the police dog had tracked a scent from the store to Petitioner, but the officer testified that he postponed canine tracking of the suspect when they saw Petitioner standing on the porch (*id.* at 9–11).  Petitioner argued the show-up was impermissibly suggestive because the witnesses saw his face during the show-up, but the robber wore a mask, and Mr. Bennet thus recognized him only because he was a regular customer of the robbed store (*id.* at 11).  The appellate court affirmed the lower court's decision without written opinion (Ex. X).

Based upon this record, the undersigned concludes Petitioner fairly and properly presented the state courts with both sub-claims of Ground One of his instant federal petition.  Additionally, the First DCA adjudicated the merits of his claim, including the sub-claims.  Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."  *See* Harrington, 131 S. Ct. at 784.  When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary.  131 S. Ct. at 784–85.  The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely.  *Id.* at 785.  The same rule applies when the state court addresses some but not all of the federal claims raised by a defendant.  When a federal claim has been presented to the state court, and the state court opinion addresses some but not all of defendant's federal claims, a rebuttable presumption arises on federal habeas review that state court adjudicated all of the federal claims on the merits.  *See* Johnson v. Williams, — U.S. —, —, 133 S. Ct. 1088, 1091, 185 L. Ed. 2d 105 (2013).

Petitioner has not overcome the rebuttable presumption in this case; indeed, Petitioner does not dispute that the First DCA adjudicated the merits of the issues he raises in Ground One.  Therefore, this court will review the First DCA's adjudication to determine whether it was based

upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of <u>Strickland</u>.

To successfully challenge an identification procedure used by law enforcement, Petitioner's counsel would have had to demonstrate that the show-up was unnecessarily suggestive and created a substantial risk of misidentification given the totality of the circumstances.  *See* <u>Neil v. Biggers</u>, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1508 (11th Cir. 1991); <u>Perez v. State</u>, 648 So. 2d 719 (Fla. 1995)).  Although show-ups are widely condemned as inherently suggestive, a show-up is not invalid if it does not give rise to a substantial likelihood of irreparable misidentification.  *See* <u>Perry v. New Hampshire</u>, — U.S. —, 132 S. Ct. 716, 720, 181 L. Ed. 2d 694 (2012) (citing <u>Simmons v. United States</u>, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)); <u>Johnson v. Dugger</u>, 817 F.2d 726, 729 (11th Cir. 1987); <u>Perez</u>, 648 So. 2d at 719.  As the Supreme Court explained in <u>Biggers</u>, in order to determine whether an identification was reliable even though the confrontation procedure was suggestive, the court must look to the totality of the circumstances.  409 U.S. at 199.  The factors to be considered in evaluating the likelihood of misidentification include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  *Id.*  "[R]eliability is the linchpin in determining the admissibility of identification testimony." <u>Manson v. Braithwaite</u>, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

While the ultimate conclusion as to the reliability of identification evidence is a mixed question of law and fact not governed by the Section 2254(d) presumption, the state court's findings on each of the <u>Biggers</u> factors are entitled to a presumption of correctness.  *See* <u>Jones v. Newsome</u>, 846 F.2d 62, 64 (11th Cir. 1988); *see also, e.g.,* <u>Hawkins v. Sec., Fla. Dep't of Corr.</u>, 219 F. App'x. 904, 907 (11th Cir. 2007) (unpublished).[3]

---

[3] The undersigned cites unpublished Eleventh Circuit cases only as persuasive authority and recognizes that the opinions are not considered binding precedent. *See* 11th Cir. R. 36-2.

In this case, the state court found that James Bennet and Melissa Mayzik had ample opportunity to view the robber at the time of the crime. The court found that both witnesses gave a description of the robber to law enforcement immediately after the robbery. The court found that law enforcement arrived within ten (10) minutes, and a canine officer began to track the suspect within approximately forty (40) minutes. The court found that Mr. Bennet and Ms. Mayzik had a good opportunity to hear the robber with good degree of attention at the time of the robbery, made prior accurate descriptions of the robber, displayed certainty in their identifications, and that there was a short amount of time between the robbery and the identifications.

Petitioner has not rebutted the presumption of correctness of the state court's findings by clear and convincing evidence. Further, the state court's findings are not clearly rebutted by the evidence in the record. At trial, James Bennet testified he and a co-worker named Melissa were working at a Tom Thumb store in Laurel Hill on the night of November 30, 2009 (Ex. C at 27–29). He testified that between 10:30 and 11:00 p.m., a man entered the store wearing a ski mask, gloves, a jacket, and blue jeans (*id.* at 29, 31–32). Bennet testified no one else was in the store at the time (*id.*). He testified all he could see was the man's eyes (*id.* at 30). Bennet testified the man said, "Give me all your money," and brandished a knife (*id.*). He testified that based upon the man's eyes and demeanor, he thought the man was a regular customer (*id.* at 30–31). He testified he also recognized the man's blue jacket as the jacket worn by the regular customer when he was in the store the prior week (*id.* at 31). Mr. Bennet testified he gave the man all of the money out of the register, including "bait money" that triggered a silent alarm (*id.* at 31–32). He testified the man left the store and went to the left behind the store, which was the same direction from which the man had entered the store (*id.* at 33). Mr. Bennet testified Melissa locked the front door and called the store manager, while he called law enforcement (*id.*). Mr. Bennet testified he provided the following description of the robber's clothing to law enforcement: "the black sougan [sic]," blue jacket, blue jeans, and black gloves (*id.* at 43–44). He estimated the robber's height as 5 feet 2 inches, but acknowledged his estimation could have been inaccurate, because he (Bennet) was standing on a platform behind the register, which makes others appear shorter (*id.* at 44, 52, 55–56). Mr. Bennet testified he told the police that the robber exited through the front door and proceeded to the left (*id.* at 44). Mr. Bennet identified Petitioner in court as the person who robbed him (*id.*). Mr. Bennet

also testified that law enforcement subsequently transported him in a patrol car to another location and brought a man to the car window for Bennet to hear his voice (*id.* at 45).  Bennet testified he saw the man's face, and when Petitioner said the phrase, "Give me all your money," he recognized Petitioner's voice as the robber's voice (*id.*).

On cross-examination, Mr. Bennet testified that one week prior to the robbery, he caught Petitioner stealing from the store, and he and Petitioner verbally argued about it (Ex. C at 46–47). Bennet testified that at first he did not realize that Petitioner was the robber and did not tell police that Petitioner was the robber because he was nervous and scared (*id.* at 47–57).  He testified that after he calmed down, and the officers took him to where the police dog led them, he realized that the robber was Petitioner based upon his eyes, build, demeanor, and voice (*id.*).  Mr. Bennet viewed photographs of the jacket Petitioner was wearing when he was arrested, and testified that it was the same jacket worn by the robber (*id.* at 58).

Melissa Mayzik testified she was working with Mr. Bennet on the night of the robbery (Ex. C at 60–61).  She testified she was stocking merchandise when she noticed light reflecting off a long blade (*id.* at 63).  She testified she saw a man wearing blue jeans, a black knit hat, and a dark colored jacket waving the blade of a knife (*id.*).  She heard the man say, "Give me all the money." (*id.*).  Ms. Mayzik testified she heard the robber leave the store, and Mr. Bennet told her they had been robbed (*id.* at 64).  She testified Mr. Bennet called law enforcement, and she called the store manager (*id.* at 65).  Ms. Mayzik testified she described the robber's clothing to police, and estimated his height as approximately 5 feet 2 inches, but acknowledged that the man was leaning over onto the counter, so her height description may have been incorrect (*id.* at 65, 68, 75).  She identified the jacket depicted in the photograph as looking like the jacket worn by the robber (*id.* at 66).  Ms. Mayzik testified that law enforcement subsequently took her to another location, and had a man stand thirty (30) feet from the patrol car where she was sitting, with his back to her, and repeat the phrase "give me all the money" a couple of times (*id.*).  She testified the man's voice was the same voice she heard during the robbery (*id.*).  On cross-examination, Ms. Mayzik testified that immediately following the robbery, Mr. Bennet told her he thought he recognized the robber, but he did not identify him by name (*id.* at 67–68).

Deputy James Duval testified that at approximately 11:30 p.m. on November 30, 2009, the sheriff's department received a report of a robbery at the Tom Thumb (Ex. C at 76, 79–80).  He testified he arrived at the store with his canine and received a description of the suspect and the direction the suspect fled (*id.* at 80).  Deputy Duval testified he asked another officer whether anyone had been on the side of the store where the subject was last seen, and the officer responded no, and that everyone had been kept away from the area (*id.* at 81).  Duval testified the outside temperature was cold, which was very conducive for canine tracking of a suspect (*id.*).  He testified he took the canine to the area where the suspect was last scene and gave a "track command" (*id.*). Duval testified that upon giving a track command, the canine runs in a circle until he finds a scent that he's searching for, and if he finds the scent he "takes off pulling quite hard" (*id.* at 82).  Duval testified that the canine picked up a scent that night, and tracked behind the Tom Thumb (*id.*).  He testified he then took a left turn, ran down the street along the edge of the road, crossed another little street, and came to a big, empty field (*id.*).  He testified the canine went through a field to another grassy area, went through a parking lot behind a restaurant, and crossed another street (*id.* at 84–85). Duval testified the grass in the fields was knee high and wet (*id.* at 87).  Duval testified the canine started to cross another road, but he (Duval) observed a man (Petitioner) standing on the porch of a trailer at 3922 Second Avenue, so he postponed the canine tracking to make sure the man did not pose a safety risk to himself and Patrolman Hurt, who was accompanying him (*id.* at 85, 89, 164–65).  Duval testified that they had tracked approximately 366 yards, which took 10–15 minutes, before stopping at the trailer (*id.* at 85–86, 100).  He testified that Petitioner immediately put his hands in the air in a surrender position, even though he had not said anything to the man, nor had the canine barked or alerted (*id.* at 87).  Duval testified he and Patrolman Hurt asked Petitioner to step off the porch, and Petitioner complied (*id.* at 87–88).  He testified they asked him his eye color, and Petitioner responded blue (*id.* at 88).  Duval testified Petitioner's height, weight, clothing, and eye color matched the description of the robber, so he notified Deputy Jackson that they found a potential suspect (*id.* at 89).  Deputy Duval testified he observed that Petitioner's shoes were wet, and he asked Petitioner why, and Petitioner responded he had been standing on his lawn (*id.* at 92). Duval testified that the grass of Petitioner's law was short, and he did not believe shoes would have gotten as wet as Petitioner's just from standing in the lawn (*id.* at 86, 93).

Deputy Buchanan testified he and Deputy Jackson arrived at the Tom Thumb and immediately secured the scene (Ex. C at 110, 112).  He testified that Mr. Bennet told him he thought he knew who the robber was and that he lived on Second Avenue, but he did not know the man's name (*id.* at 118).  Buchanan testified he later relocated to the location where Deputy Duval located a suspect, on Second Avenue (*id.* at 112–13).  He testified he asked Petitioner if he had been to the Tom Thumb, and Petitioner responded no, and that his mother could vouch for the fact that he had been at home all night (*id.* at 113).  Buchanan testified that the grass of the lawn was tall enough to soak a person's shoes all the way up to the tongue of the shoe, but not a boot (*id.* at 121–22, 124).

Deputy Jackson testified he responded to the Tom Thumb at 11:34 p.m., ten (10) minutes after law enforcement received an alarm call from the store (Ex. C at 125–27).  He testified he corded off the area to preserve the scene for the canine (*id.* at 128).  Deputy Jackson received a description of the suspect from Mr. Bennet and Ms. Mayzik, and broadcasted the description on his police radio (*id.*).  Jackson testified Mr. Bennet told him he recognized the robber's eyes, and that he believed the robber had been in the store a couple of days prior (*id.* at 144).  Jackson testified that when Deputy Duval arrived, he advised him of the robber's last know direction of travel, as described by Mr. Bennet (*id.* at 129).  Deputy Jackson testified that at 12:31 a.m., Deputy Duval notified him that he located a possible suspect at 3922 Second Avenue, so he went to the location and conducted a "non-custodial interview" (*id.* at 129, 142).  Jackson testified he asked Petitioner what he was doing outside, and why his boots and pants were wet, and Petitioner responded that he had been in the house all night (*id.* at 130).  Jackson testified he went back to the store and separately brought each witness to the Second Avenue address in his patrol car (*id.*).  He testified Petitioner stood on the side of the roadway facing the patrol car, and he shone his spotlight on him (*id.*).  He testified the witnesses verified that the clothing Petitioner was wearing was the same type of clothing worn by the robber (*id.*).  Deputy Jackson testified he asked Petitioner to consent to state a phrase, and Petitioner consented (*id.*).  He testified that when Petitioner said the phrase "give me all the money," Mr. Bennet "said that was absolutely the same voice that he had heard in the store stating that same phrase" (*id.* at 131).  Deputy Jackson testified he employed the same procedure with Ms. Mayzik, when Mr. Bennet was out of the area, and Ms. Mayzik stated that the voice was

the same as the robber's (*id.* at 131–32).  Jackson testified he conducted the voice identification at approximately 12:58 a.m. (*id.* at 143).  He testified he then arrested Petitioner (*id.* at 133).

Petitioner testified he had seen Mr. Bennet at the Tom Thumb store a few times (Ex. C at 153).  He admitted that he and Mr. Bennet had a "verbal altercation," but he disagreed with Bennet's description of the nature of the "altercation" (Ex. C at 153, 157–58).

In light of the state court's findings with regard to the <u>Biggers</u> factors, as well as the additional fact that Mr. Bennet was familiar with Petitioner's voice from the prior "verbal altercation," and the fact that Mr. Bennet and Ms. Mayzik were not together when they each made the identification and thus were not exposed to any suggestive influence of the other, Petitioner has failed to demonstrate that the state court unreasonably applied <u>Strickland</u> in concluding that defense was not ineffective for failing to challenge the admissibility of the identification evidence on the ground that it was impermissibly suggestive.  *See* <u>Perez</u>, 648 So. 2d 719 (out-of-court and in-court identifications were admissible, even though victim was taken to view assailant where he was apprehended several miles away, because circumstances bore indicia of reliability, namely, identification was made one or two hours after assault, assault occurred in broad daylight, victim was within eight to ten feet of assailant, and victim had clear view of assailant for approximately one minute); <u>State v. Guerra</u>, 455 So. 2d 1046, 1048–49 (Fla. 3d DCA 1984) (out-of-court identification was admissible, even though police told victim that car matching victim's description with two occupants  had been stopped, and police took victim to place where car and occupants were being detained, because circumstances bore indicia of reliability, namely, only one-half hour elapsed between robbery and identification, and victim positively identified vehicle, firearm, and driver-robber); *see also, e.g.*, <u>United States v. Walker</u>, 201 F. App'x 737 (11th Cir. 2006) ("Walker argues that the identification was unduly suggestive because Walker was presented for identification singly, in handcuffs, and surrounded by police officers . . . .  Walker cites no authority for his position that identification of a single individual is intrinsically suggestive, and our precedent suggests that it is not.").  Therefore, Petitioner is not entitled to habeas relief as to this sub-claim of Ground One.

Additionally, Petitioner has failed to demonstrate he is entitled to relief on his claim that counsel was ineffective to failing to argue that the identification evidence was the result of an illegal

detention by law enforcement, specifically, ordering him off his porch while brandishing a firearm, and conducting the show-up without advising him of his right to counsel (doc. 1 at 5; doc. 23 at 2–3).

Petitioner described his encounter with the officers in his trial testimony.  He testified he went into the Tom Thumb store at 7:30 p.m. on the night of the robbery (Ex. C at 153).  He testified that later that night, at approximately 11:30 p.m., he walked out onto his front porch and saw the officers and the canine looking in a pile of brush across the street (*id.* at 153–54).  Petitioner testified he asked the officers what was going on, and they approached him (*id.* at 154, 158).  Petitioner testified the officers did <u>not</u> have firearms when they approached him (*id.* at 154).  He testified an officer asked him to "come over," and when he walked to the edge of his porch, the officer asked why his boots were wet (*id.*).  Petitioner testified he answered that he had worked in the rain that day (*id.*).  Petitioner denied that he raised his arms in the air (*id.*).  He testified the officers told him there had been a robbery, and they were looking for the suspect (*id.* at 155).  He testified they asked him if he had seen anyone, and he responded no (*id.*).  Petitioner testified the officers took him from the porch to his front of the yard, and he and Patrolman Hurt stood and talked (*id.* at 155–56).  He testified a patrol car arrived, and he "looked dead at the witnesses" (*id.* at 156).  He testified he recognized Mr. Bennet in the car (*id.*).  Petitioner testified an officer grabbed his arm and walked him 30–50 from the road to the front of the patrol car (*id.*).  He testified the officer instructed him what to say, and he said what the officer asked him to say (*id.*).  He testified he did not voluntarily participate in the show-up (*id.* at 159).  He testified, "He [the officer] just grabbed my arm and told me to walk up there and told me what to say." (*id.*).  Petitioner admitted at trial that he had blue eyes, and that he and Mr. Bennet had a "verbal altercation" prior to the night of the robbery (*id.* at 153, 157–58, 161).  He also admitted he was wearing blue jeans and the jacket shown in the State's photographs when he spoke with the officers, and he admitted he had been wearing that clothing all day, even when he went to the Tom Thumb earlier that evening (*id.* at 161).  He testified he was 5 feet 9 inches tall (*id.* at 162).  He admitted he had twice been convicted of a crime involving dishonesty (*id.* at 156).

To show that counsel was ineffective, Petitioner must demonstrate a reasonable probability that the trial court would have granted a motion to suppress on the ground that the officers illegally

detained him and failed to advise him of his right to counsel prior to the show-up identifications. In <u>United States v. Cortez</u>, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), the Supreme Court described the requirements necessary for an officer to conduct a lawful stop:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person.  Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise.  But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

449 U.S. at 417–18 (citations omitted); *see* <u>Terry v. Ohio</u>, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  As stated in <u>Ornelas v. United States</u>, 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996):

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.

517 U.S. at 696.  The standard to apply to an officer's actions in making a stop is whether the officer had a minimal objective basis of suspecting legal wrongdoing.  *See* <u>Illinois v. Wardlow</u>, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

Once a suspect is taken into custody, the Supreme Court established in <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), "certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." <u>Duckworth v. Eagan</u>, 492 U.S. 195, 201, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989).  Intent on "giv[ing] concrete constitutional guidelines for law enforcement agencies and courts to follow," <u>Miranda</u> prescribed the following four now-familiar warnings:

> [A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 441–42, 479.

Because these measures protect the individual against the coercive nature of custodial interrogation, they are required "'only where there has been such a restriction on a person's freedom as to render him "in custody.'"  Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed .2d 714 (1977) (per curiam)).  As the Supreme Court repeatedly emphasized, whether a suspect is "in custody" is an objective inquiry.

> Two discrete inquiries are essential to the determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (internal quotation marks, alteration, and footnote omitted); see also Yarborough v. Alvarado, 541 U.S. 652, 662–63, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004); Stansbury, 511 U.S. at 323; Berkemer v. McCarty, 468 U.S. 420, 442, & n.35, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).  Rather than demarcate a limited set of relevant circumstances, the Court has required law enforcement officers and courts to "examine all of the circumstances surrounding the interrogation," Stansbury, 511 U.S. at 322, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave." Id. at 325.  The test, in other words, involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning. See Alvarado, 541 U.S. at 667.  Further, the "subjective views harbored by either the interrogating officers" (or the person being questioned) are irrelevant. Stansbury, 511 U.S. at 323.

The benefit of the objective custody analysis is that it is "designed to give clear guidance to the police." Alvarado, 541 U.S. at 668. But see Berkemer, 468 U.S. at 441 (recognizing the "occasiona[l] . . . difficulty" that police and courts nonetheless have in "deciding exactly when a suspect has been taken into custody").  Law enforcement must make in-the-moment judgments as to when to administer Miranda warnings.  By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave, the objective test avoids burdening law enforcement

with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind.  *See* Berkemer, 468 U.S. at 430–31 (officers are not required to "make guesses" as to circumstances "unknowable" to them at the time); Alvarado, 541 U.S. at 668 (officers are under no duty "to consider . . . contingent psychological factors when deciding when suspects should be advised of their Miranda rights").

In the instant case, the following evidence supported the officers' reasonable, articulable suspicion that Petitioner had just committed the robbery, and thus provided a legally sufficient basis for the officers to question and temporarily detain him:  (1) ten (10) minutes after law enforcement received the alarm call, Deputy Jackson arrived at the store and received a physical description of the robber's clothing and the robber's direction of travel when he left the store; (2) the canine tracked from the robber's direction of travel to the street where Petitioner resided; (3) Petitioner initiated contact with the officers; (4) Deputy Duval observed that Petitioner put his hands up in the air, even though neither of the officers had yet spoken to Petitioner[4]; (5) Petitioner's boots were wet; (6) Petitioner's clothing was similar to the robber's clothing, as described by the witnesses, and (7) Petitioner told the officers that his eyes were blue, which was the robber's eye color.  *See* United States v. Hicks, 531 F.3d 555, 558 (7th Cir. 2008) (a stop typically is justified when a suspect matches the description of a person involved in a disturbance near in time and location to the stop). Therefore, Petitioner's counsel was not ineffective for failing to argue that the officers illegally detained Petitioner while he was on the porch.

The question of whether the investigatory stop converted to a custodial interrogation requiring Miranda warnings when the officers escorted Petitioner off his front porch, took him by the arm and walked him 30–50 feet to the front of the patrol car, and asked him to repeat the phrase "give me all the money," in order to assist them in dispelling or confirming their suspicions that he had committed the robbery, is less clear, but it would not be unreasonable to conclude that it was not a custodial interrogation.  Courts have held that Miranda warnings were not required in similar—or even more coercive—circumstances, which undercuts Petitioner's argument that counsel

---

[4] At trial, Petitioner denied he put his hands in the air, but in his federal habeas petition, which he signed under penalty of perjury, he states he "had raised his hands in a surrender position" (doc. 1 at 5).

performed ineffectively by failing to seek suppression on this ground.  *See, e.g.,* United States v. Benson, 686 F.3d 498 (8th Cir. 2012) (holding that placing a shoplifting suspect into a patrol car and transporting him to the store where the shoplifting occurred did not convert an investigative stop into an arrest, in violation of Fourth Amendment, where, following an investigatory stop, the suspect was moved to the store for a show-up identification to help dispel or confirm officer's suspicions that he had committed a crime); Cruz v. Miller, 255 F.3d 77, 86–87 (2d Cir. 2001) (holding that the state courts did not unreasonably apply clearly established Supreme Court law in concluding that petitioner Cruz was not in custody for purposes of Miranda, where: (1) witnesses provided officers with the physical description of the shooter and told officers that the shooter went in direction of train station; (2) officers observed Cruz, who fit the description of the shooter, exit the train; (3) an officer approached Cruz with his gun drawn; (4) the officer questioned Cruz about where he had come from; (5) Cruz was crying and shaking when responding to the officer's questions; (6) four or five other officer gathered near Cruz; (7) Cruz was not physically restrained during the questioning; (8) officers acknowledged they would not have allowed Cruz to leave if he had attempted to do so, but they did not tell this to Cruz during questioning; (9) the questioning ended when a patrol car containing a witness arrived, and the witness identified Cruz as the shooter; and (10) the officer then arrested Cruz and informed him of his Miranda rights); United States v. Cason, No. 6:08cr206-Orl-22DAB, 2009 WL 500487, *6 (M.D. Fla. Feb. 27, 2009) (unpublished) (cuffing, frisking, and holding suspect while waiting for witness to arrive for a show-up is within the bounds of a permissible investigatory stop, even if suspect was not free to leave).  *See also* United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006) ("Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, "'[c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home.") (citing United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting 1 W. LaFave, Criminal Procedure § 6.6(e), at 496 (1984 & 1991 Supp.)); United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (noting that "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial"); United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991) (stating that a court should consider

whether the suspect was questioned in "familiar or at least neutral surroundings" (quotation marks omitted)); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) (finding it relevant in determining that defendant was not in custody that the questioning occurred in the defendant's home, "on his own turf" (quotation marks omitted)); United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (status as a "suspect," and "'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, did not automatically create a custodial situation") (citing United States v. Phillips, 812 F.2d 1355, 1360–61 (11th Cir. 1987) (interview of suspect by police officers in station not custodial)). *Cf.* Hayes v. Florida, 470 U.S. 811 (1985) (transporting a suspect from his home to a police station for questioning goes beyond the scope of a Terry stop and effects an arrest for which there must be probable cause).

Further, the question presented here is not whether this court would find, on *de novo* inquiry, that Petitioner's counsel was ineffective in failing to seek suppression of the identification evidence on the ground that the officers were required to advise Petitioner of his Miranda rights prior to the identification; rather, the question is whether the state courts unreasonably applied Strickland in determining that Petitioner's counsel was not ineffective. "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Richter, 131 S. Ct. at 788. "Where the highly deferential standards mandated by Strickland and AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.'" Downs v. Sec'y, Fla. Dep't of Corr., 738 F.3d 240, 258 (11th Cir. 2013) (quoting Richter, 131 S. Ct. at 788). "This double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Id.* (internal quotation marks and citation omitted).

Here, there is a reasonable argument that Petitioner's counsel was not ineffective, as assessed under the Strickland standard, with regard to his failure to challenge the identification evidence as the product of an illegal detention. Therefore, the state court's denial of relief on this sub-claim was not unreasonable.

Petitioner failed to show that the state court's adjudication of Ground One, including its sub-claims, was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief.

## IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>3</u><sup>rd</sup> day of June 2014.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**